UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
────────────────────────────────────────

LEONARD SMITH,

                                        Plaintiff,

            -vs-

                                                        02-CV-0533-C(Sr)

JO ANNE B. BARNHART,
Commissioner of Social Security,

                                        Defendant.
────────────────────────────────────────


        Plaintiff Leonard Smith initiated this action pursuant to 42 U.S.C. § 405(g) seeking

a review of the determination of the Commissioner of Social Security (the "Commissioner")

denying his application for Social Security disability insurance ("SSDI") benefits.[1]   The

Commissioner has filed a motion for judgment on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure (Item 9), and plaintiff has cross-moved for the same

relief (Item 11).   For the following reasons, the Commissioner's motion is denied and

plaintiff's cross motion is granted.


## BACKGROUND

        Plaintiff was born on April 14, 1957 (T. 82).[2]   He applied for SSDI benefits on

November 5, 1996 and June 11, 1998 alleging disability since March 26, 1996 (T.157-59,

171-74).   Those applications were denied on February 20, 1997 and October 15, 1998,

────────────────────

        [1]  This case was transferred to the undersigned by order of the Hon. Richard J. Arcara dated
October 26, 2006 (Item 16).

        [2]  References preceded by "T." are to page numbers of the transcript of the administrative record,
filed by defendant as part of the answer to the complaint (Item 5).

respectively (T.132-35, 147-50). Plaintiff applied for benefits again on May 13, 1999, alleging disability as of March 26, 1996 due to lower back injury and pain, affective disorder, and mental retardation (T. 60-63). Plaintiff's application was denied initially on September 28, 1999 (T.136-39) and again after reconsideration on March 16, 2000 (T.142-44). Plaintiff requested a hearing, which was held on May 1, 2001 before Administrative Law Judge ("ALJ") Barbara L. Beran (T. 77-127). Plaintiff testified at the hearing and was represented by Julie A. Smith, Esq. John S. Wolfe, M.D., a Board-certified orthopedic surgeon, testified as a medical expert and Lynne M. Kaufman, M.S., testified as a vocational expert ("VE").

By decision dated October 24, 2001, the ALJ found that plaintiff was not under a disability within the meaning of the Social Security Act (T. 24-65). Following the sequential evaluation process outlined in the Social Security Administration Regulations, *see* 20 C.F.R. § 404.1520, the ALJ reviewed the medical evidence and determined that plaintiff's impairments included: lumbar degenerative disc disease, status post laminectomy with disc removal and spinal fusion; diabetes mellitus; status post hand injury with flexion deformity of the third through fifth fingers; affective disorder; and borderline intellectual functioning (T. 64). While severe, the ALJ found this combination of impairments did not meet or equal the criteria of an impairment listed in the Regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). The ALJ considered plaintiff's allegations and testimony regarding his functional limitations, but found plaintiff to be not credible in this regard (T. 57-61, 64). The ALJ also determined that plaintiff was unable to perform his past work. Plaintiff had previously worked as a industrial truck driver, which was considered semiskilled with no transferable skills (T. 63-64, 119-22), and as a cutter operator and a

2

soap pad machine operator, which were considered unskilled (T. 53, 64).  The ALJ found

that plaintiff had the residual functional capacity for a limited range of light work[3] limited to

relatively low stress, simple tasks that do not require functional literacy (T. 64).  The ability

to perform light work when considered along with plaintiff's age (44 at the time of the

decision), limited educational background, and the testimony of the medical and vocational

experts, led to the ALJ's conclusion that there are a significant number of jobs in the

national economy that plaintiff could perform (T. 64). The ALJ's decision became the

Commissioner's final determination on June 7, 2002, when the Appeals Council denied

plaintiff's request for review (T.16-17).

Plaintiff commenced this action on July 25, 2002, pursuant to 42 U.S.C. § 405(g)

(Item 1).  On December 27, 2002, the Commissioner filed an answer (Item 5).  On

March 27, 2003, the Commissioner filed a motion for judgment on the pleadings on the

ground that the ALJ's determination is supported by substantial evidence in the record

(Item 9).  Plaintiff filed a cross-motion for judgment on the pleadings on March 27, 2003,

arguing that the denial of his application was improper because the ALJ failed to properly

evaluate all of the objective medical evidence and the opinions of plaintiff's treating

sources, resulting in erroneous findings regarding residual functional capacity (Item 11).

---

[3] Light work requires the ability to lift no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds.  20 C.F.R. § 404.1567(b).  A job is in this category also
requires "a good deal of walking or standing, or . . . involves sitting most of the time with some pushing
and pulling of arm or leg controls." *Id.*  "To be considered capable of performing a full or wide range of
light work, you must have the ability to do substantially all of these activities. If someone can do light work,
. . . he or she can also do sedentary work . . .." *Id.*

For the reasons that follow, the Commissioner's motion for judgment on the pleadings is denied, and plaintiff's cross-motion for summary judgment is granted.

## DISCUSSION

### I.  Scope of Judicial Review

The Social Security Act states that upon district court review of the Commissioner's decision, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  Substantial evidence is defined as evidence which "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), *quoted in Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Tejada v. Apfel*, 167 F.3d 770, 773-72 (2d Cir. 1999).  Under these standards, the scope of judicial review of the Commissioner's decision is limited, and the reviewing court may not try a case *de novo* or substitute its findings for those of the Commissioner.  *Richardson*, 402 U.S. at 401.  "The court's sole inquiry is 'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner."  *Winkelsas v. Apfel*, 2000 WL 575513, at *2 (W.D.N.Y. February 14, 2000) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

However, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards."  *Klofta v. Mathews*, 418 F. Supp. 1139, 1411 (E.D.Wis. 1976), *quoted in Gartmann v. Secretary of Health and Human Services*, 633 F. Supp. 671, 680 (E.D.N.Y. 1986).  The Commissioner's determination cannot be upheld when it is based

on an erroneous view of the law that improperly disregards highly probative evidence. *Tejada*, 167 F.3d at 773.

## II.  Standards for Determining Eligibility for Disability Benefits

To be eligible for disability insurance benefits under the Social Security Act, plaintiff must show that he suffers from a medically determinable physical or mental impairment "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .," 42 U.S.C. § 423(d)(1)(A), and is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1505(a).

The Regulations set forth a five-step process to be followed when a disability claim comes before an ALJ for evaluation of the claimant's eligibility for benefits.  *See* 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is presently engaged in substantial gainful activity.  If the claimant is not, the ALJ must decide if the claimant has a "severe" impairment, which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).  If the claimant's impairment is severe, the ALJ then determines whether it meets or equals the criteria of an impairment found in the Listings. If the impairment meets or equals a listed impairment, the claimant will be found to be disabled.  If the claimant does not have a listed impairment, the fourth step requires the ALJ to determine if, notwithstanding the impairment, the claimant is capable of performing

5

his or her past relevant work.  Finally, if the claimant is not capable of performing the past relevant work, the fifth step requires that the ALJ determine whether the claimant is capable of performing other work which exists in the national economy, considering the claimant's age, education, past work experience, and residual functional capacity ("RFC"). *See Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); *Reyes v. Massanari*, 2002 WL 856459, at *3 (S.D.N.Y. April 2, 2002).

The claimant bears the burden of proof with respect to the first four steps of the analysis.  If the claimant demonstrates an inability to perform past work, the burden shifts to the Commissioner to show that there exists other work that the claimant can perform. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).  The Commissioner ordinarily meets his burden at the fifth step by resorting to the medical vocational guidelines set forth at 20 C.F.R. Pt. 404, Subpart P, Appendix 2 (the "Grids").[4]  However, where the Grids fail to describe the full extent of a claimant's physical limitations, the ALJ must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform."  *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).

In this case, the ALJ found that plaintiff's insured status for disability insurance benefits expired on March 31, 2001 (T. 63).  Although the first step in the sequential evaluation is to determine whether the plaintiff is engaging in substantial gainful employment, the ALJ deferred this finding (T. 63).  Plaintiff stated that he was working for

---

[4]The Grids were designed to codify guidelines for considering residual functional capacity in conjunction with age, education and work experience in determining whether the claimant can engage in any substantial gainful work existing in the national economy.  *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *see also Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).

Red Baron Truck Wash performing janitorial work ten to twenty hours a week, three to four hours a day (T. 35, 87, 107).  The ALJ acknowledged this work activity, but deferred the determination as to whether the work constituted substantial gainful activity (T. 63).  Next, the ALJ concluded plaintiff had: "lumbar degenerative disc disease, status post complete laminectomy of L5 with removal of the L4-5 disc on the right and the L5-S1 disc on the left, with spinal fusion from L4 to S1 with pedicular fixation on September 27, 1996; diabetes mellitus; status post right hand injury in 1985, by history, with resultant flexion deformity of third, fourth, and fifth digits; affective disorder; and borderline intellectual functioning." ( T. 64).  The ALJ decided plaintiff's combined aliments were "severe" and had been at all times since March 26, 1996, but that the impairments did not individually or in combination meet or equal the requirements of the Listings.  *Id.*  The ALJ determined the plaintiff's residual functional capacity to include:

> lifting/carrying and pushing/pulling up to ten pounds frequently
> and twenty pounds occasionally; no limitation on ability to sit with
> normal breaks throughout an eight-hour workday; standing for
> forty-five to sixty minutes at one time with a five minute hiatus for
> a total of four to six hours in an eight-hour workday; occasional
> bending; no crawling, balancing, climbing ladders or working around
> hazards; cannot use the third, fourth, and fifth fingers on his right
> hand to pinch or for fine manipulation; and, for his mental basis,
> a relatively low stress of simple tasks that do not require functional
> literacy.

*Id.*  The ALJ found plaintiff's complaints of disabling pain not credible (T. 57-61, 64). Based on his RFC and testimony of the vocational expert, the ALJ determined that plaintiff could not return to any of his past relevant work (T. 63, 64).  Plaintiff is considered to be a "younger individual" with a limited education (T. 63).  His previous work was considered unskilled or semiskilled, with no transferrable skills (T.53, 63). The VE then testified that

based upon plaintiff's residual functional capacity, there are 1,500 unskilled "light" jobs in the area of plaintiff's residence such as laundry worker, cleaner, and packer (T. 63).  The ALJ concluded thus that a significant amount of substantial gainful work was available to the plaintiff to perform (T. 64).  Accordingly, the ALJ found that plaintiff was not disabled nor has he been under a disability at  any time since the alleged onset date of March 26, 1996 through the date of the decision.  *Id.*

In his motion for judgment on the pleadings, the Commissioner asks that the determination be upheld as it is supported by substantial evidence in the record (Item 10). In his cross motion for judgment on the pleadings, plaintiff seeks reversal of this determination and a remand solely for the purposes of calculation of benefits.

### III.  Medical Evidence

Plaintiff began seeing his treating physician, Dr. Rohner, on April 30, 1996 due to a lower back injury that he sustained in March 1996 (T. 309-10).  Plaintiff had diminished sensation in the left leg, tenderness, and range of motion limitations. *Id.*  Plaintiff walked with a limp. *Id.* His reflexes and pulses remained intact. *Id.* An x-ray revealed multiple degenerative joint disc disease changes. *Id.*  Plaintiff claimed the pain radiated down his back to his left foot and interfered with his sleep (T. 36).  He was uncomfortable and his dorsolumbar spine's range of motion was restricted. *Id.*  Chiropractic therapy had not helped his condition. *Id.  Dr.* Rohner diagnosed degenerative disc disease and acute left radiculopathy and prescribed Percocet, Soma, and Medrol Dosepak. *Id.*  Dr. Rohner also recommended a combination of bed rest and placing a heat pad on his back and two pillows under his knees. *Id.*

On June 28, 1996, a lumbosacral spine MRI revealed left paracentral disc herniation at L5-S1, with compression of the left S1 nerve root; right paracentral disc protrusion at L4-5 with mild flattening of the thecal sac; and central disc protrusion at T11-12 with mild flattening of the anterior aspect of the cord (T. 36, 374).  An EMG showed normal results with no evidence of radiculopathy (T. 375).  On July 2, 1996, Dr. Rohner reported that an MRI revealed herniated discs at L4-5 and L5-S1 (T. 312).  Dr. Rohner determined that plaintiff probably had a herniated disc and excused him from work for three months (T. 311).

Plaintiff was treated at the Grant/Riverside Methodist Hospital under the care of Dr. Rohner on September 16, 1996 for back pain (T. 376-402).  An MRI revealed herniated discs (T. 379).  Plaintiff's diabetes and hypertension were stabilized and he underwent a laminectomy of L4, removal of herniated discs at L4-5 and L5-S1, and pedicle screw stabilization transverse process fusion at L4-S1 (T. 377).  During plaintiff's stay at the hospital, a psychologist diagnosed an adjustment disorder with mixed emotional features which contributed to a marked difficulty in dealing with pain-related stress and an inability to work (T. 377, 382-83).

In November of 1996, x-rays showed status post posterior fusion, a laminectomy defect at L5, and well-aligned vertebrae (T. 241, 405).  Dr. Rohner noted that plaintiff's reflexes were intact.  Dr. Rohner diagnosed status post resection of herniated discs and recommended that plaintiff begin swimming for exercise (T. 315).  From March 1996 to December 1996, Michael Green, a chiropractor, treated plaintiff and noted that plaintiff could not stand for any amount of time or carry objects (T. 407-09).

Dr. Rohner noted on January 14, 1997 that plaintiff would not flex or extend and had

lumbar tenderness (T. 316).  Plaintiff's left thigh was visibly atrophic, yet an x-ray showed no changes since November 1996 (T. 242).   Dr. Rohner recommended an EMG, rehabilitation, and prescribed Zoloft and Oruvail (T. 316).

On January 28, 1997, Dr. James H. Rutherford, a consultative physician, examined the plaintiff.  Dr. Rutherford noted that although plaintiff could drive, he had difficulty getting into the vehicle, dressing himself, and bending (T. 410).  Plaintiff had a slight forward list in his gait, difficulty changing positions and lying on his back, could not tandem walk , and could only do 30% of a deep knee bend (T. 411).  Plaintiff had a fair ability to stand on his heels and toes and had four out of five strength in his left extensor hallucis longus.  Plaintiff performed straight leg raising to thirty and forty-five degrees on the left and right, respectively, and had lumbar tenderness. His pulses were palpable, and his calf circumferences were equal. Sensation was intact and deep tendon reflexes were 1+ (T. 411).  Plaintiff had marked range of motion limitations of the lumbar spine (T. 417).  X-rays confirmed degenerative disc disease at L4-S1 with laminectomy and fusion (T. 413).  The physician concluded that plaintiff was temporarily totally disabled, eliminating the possibility of sedentary work (T. 412).  Dr. Rutherford found plaintiff would not reach maximum medical improvement until one year post-surgery and it was likely plaintiff could not work until that time (T. 412).

Dr. Edmond W. Gardner, a state review physician, reviewed plaintiff's medical records on February 7, 1997 and concluded that plaintiff could lift ten pounds frequently and twenty pounds occasionally, sit with normal breaks for six hours, and stand and/or walk with normal breaks for six hours a day (T. 419, 425).  Gardner found plaintiff had no pushing or pulling limitations, could occasionally perform all postural functions, and had no

manipulative limitations (T. 419-21).

Dr. Rohner reported on March 25, 1997 that an EMG revealed acute and chronic left S1 radiculopathy (T. 317-18).  Dr. Rohner noted that plaintiff had no back motion. Plaintiff's reflexes were intact, but extension of the knee caused pain (T.317).  Dr. Rohner prescribed  Oxycontin and Zoloft.  On July 1, 1997, Dr. Rohner reported that plaintiff was barely moving, his back was rigid and diffusely tender, and his reflexes were intact.  Knee extension continued to cause pain (T.319).

In July 1997, plaintiff was treated for a groin infection and hyperglycemia at the Madison County Hospital (T. 320-25).  In August 1997, a CT scan showed post-surgical changes with screw placement and posterior lateral fusion mass, but no stenosis or disc herniation (T. 243).  A myelogram revealed no evidence of recurrent lesions (T. 244-45). Dr. Rohner recommended a back rehabilitation program (T. 245).

Plaintiff was evaluated by Dr. Julia D. Weinerman on September 4, 1997.  Plaintiff's vocational goals were not clear, and he needed help as he was unsure that he could handle factory work.  Plaintiff's left deep tendon reflexes and sensation in his left leg were diminished, his left leg was one centimeter larger than his right leg, and strength testing revealed give-way to resistance in the great toe extensors and hip flexors.  Plaintiff's grip strength was normal besides deformity and stiffness in his right hand.  Lumbar forward flexion was limited by fifteen degrees, and plaintiff could laterally bend to twenty degrees and extend zero degrees.  Plaintiff had back tenderness, limped slightly, and could not walk on his heels or lie on his back.  He could, however, take a few steps on his toes and did a mild squat.  Dr. Weinerman found plaintiff had chronic low back pain and a right hand injury with residual deformities. Dr. Weinerman recommended a reconditioning program,

pain management education, weaning from pain medication, weight loss, and sleep medication. Although plaintiff showed pain behavior, he desired to begin rehabilitation and return to work (T. 246-47).

On October 7, 1997, Dr. Rohner reported that rehabilitation had helped plaintiff considerably (T. 326). Dr. Rohner continued on to say that plaintiff was "definitely better" and recommended continued rehabilitation. However, plaintiff's tenderness and knee extension pain remained. On November 4, 1997, Dr. Rohner noted plaintiff had been doing very well up until several days previous (T. 327). Plaintiff's back was rigid and tender, yet his reflexes were intact. Extension of the knee caused backache. Dr. Rohner determined plaintiff needed massages and a prescription for Medrol Dosepak, Soma and Percocet (T. 327).

On November 18, 1997; December 2, 1997; and April 18, 1998; clinical examinations of plaintiff remained unchanged (T. 328-30). Dr. Rohner found that plaintiff was mentally decompensating and that depression was a major issue. Dr. Rohner continued to recommend physical therapy and prescribed Neurontin, Oruvail, Loricet, and Paxil (T. 328-30).

Dr. John T. Duddy, a consultative physician, found on August 28, 1998 that plaintiff was not in acute distress (T. 248-49). Plaintiff understood directions and followed them well. Plaintiff walked with a normal gait, walked on his heels and toes, and got on and off the examination table without difficulty. Plaintiff's motor strength measured a five out of five, except for his left great toe extensor which was considered "good" at a four out of five (T. 249, 252). Plaintiff's right grip strength was diminished, but he had no difficulty picking up or manipulating objects. He had no muscle spasms, spasticity, clonus or primitive

12

reflexes. The range of motion in plaintiff's cervical spine, shoulders, elbows, wrists, hips, and knees was normal (T. 249, 253-54). Plaintiff could forward flex his dorsolumbar spine to sixty degrees out of ninety, extend to ten degrees out of thirty, and laterally flex to twenty degrees out of thirty. Deep tendon reflexes were 2+; yet, the left Achilles tendon was a 1+ (T. 249). Plaintiff had diminished sensation in his left thigh, straight leg raising test was grossly negative, and his pain complaints were atypical (T. 250). He had mild left leg atrophy and x-rays showed a large fusion mass of L4-S1 and screw fixation, but no pseudoarthrosis (T. 250). Plaintiff had no other sensory abnormalities. Dr. Duddy concluded that plaintiff had persistent pain and objective findings of atrophy, but minimal weakness (T. 250). Dr. Duddy stated that plaintiff could lift ten pounds frequently and twenty-five pounds occasionally. He also stated that plaintiff could stand and walk for only four hours due to pain exacerbation and should alternate between sitting and standing for up to one hour at a time. Plaintiff had no deficits in handling or traveling and appeared to be of average to above average intelligence (T. 250).

On August 11, 1998, Dr. Alan White, a consultative psychologist, stated that plaintiff complained of mild depression, mild anxiety, fatigue, guilt, apathy, and a short temper (T. 255-56, 257-58). Plaintiff denied social isolation, loss of appetite or suicidal attempts or ideation (T. 258). Plaintiff had never received mental health counseling and had never taken any medication for anxiety or depression (T. 256). He was able to drive and able to feed, bathe, and groom himself (T. 257). Plaintiff socialized with his family several times a week and with friends one or two times a month (T. 257). Dr. White concluded that plaintiff was oriented with no significant delusions or psychosis (T. 258). Plaintiff denied hallucinations, paranoia, fears, phobias, compulsions, and obsessions. Plaintiff's

knowledge level was average.  He knew the current and former president and governor and could repeat five digits forward and four digits backward.  He had a below average ability to abstract and was in the borderline range of intelligence with a performance IQ of 74, verbal IQ of 73, and full scale IQ of 71 (T. 259-60).  Plaintiff read at the first grade level. *Id.*  Dr. White found plaintiff to have dysthymic disorder, borderline intellectual functioning, and psychosocial and environmental problems that were primarily financial and occupational (T. 260).  Plaintiff's global assessment of functioning ("GAF") was a sixty-one. Plaintiff was mildly impaired in his ability to remember, concentrate, and attend and withstand stress, yet his ability to follow simple directions or to get along with coworkers, supervisors, or the public was not significantly impaired (T. 260-61).  Dr. White stated that plaintiff would probably have disruptive problems secondary to depression and fatigue, particularly with work perseverance over prolonged periods of time, including full workdays and weeks (T. 261).

A state agency medical consultant reviewed plaintiff's medical evidence on September 22, 1998 and stated that plaintiff could lift twenty pounds occasionally and ten pounds frequently.  Jerry G. Liepack, M.D., concluded that plaintiff could sit and stand and/or walk for six hours each a day (T. 264, 270).  Plaintiff could perform postural activities frequently, but should not climb ladders, ropes or scaffolds (T. 265).  Dr. Liepack did not place limitations on plaintiff's ability to push, pull, or manipulate (T. 264, 266).

Dr. Roseann F. Umana, a State agency psychological consultant, reviewed the medical evidence on October 4, 1998 and stated that plaintiff could understand, remember, and carry out simple instructions; adequately relate to co-workers and supervisors; deal with changes in his routine; and make simple work-related decisions despite having

14

dysthymia and a borderline IQ (T. 272-74).  However, plaintiff was moderately limited in his ability to deal with ordinary work pressures; to concentrate and attend to a task for more than two hours; and to understand, remember, and carry out complex tasks (T. 272-74).

On November 24, 1998, Dr. Rohner found that plaintiff moved very slowly and was hypersensitive to paraspinal palpation (T. 332, 445).  Plaintiff had no range of motion or left Achilles's reflex.  All other reflexes remained intact.  Dr. Rohner prescribed Paxil, Parafon Forte DSC, and Norco (T. 332, 445).  On February 23, 1999, plaintiff's knee and ankle jerks were normal and his knee extension test was unremarkable.  However, his back remained rigid and tender. Rohner cleared plaintiff to return to work on March 1, 1999 "as tolerated" (T. 333, 444).

Plaintiff met with Dr. Scott Lewis Donaldson, a consultative psychologist, on June 22, 1999 (T. 334-35).  Dr. Donaldson noted the plaintiff was appropriately dressed, groomed, and his speech was normal.  Plaintiff had no difficulty elaborating on his goal-oriented and well-organized responses as he did not reveal any flight of ideas or loose associations. Plaintiff's affect was flat and his mood was depressed.  Although he had suicidal ideas, he had no suicidal plan, paranoia, delusions, or hallucinations (T. 335-36). Plaintiff revealed that sometimes he felt hopeless, helpless, and was nervous.  Plaintiff's memory remained intact and his awareness and level of psychomotor activity were normal. Plaintiff's intelligence appeared to be borderline and his judgment limited (T. 336).  He had IQ scores of 66 in verbal, 72 in performance, and 67 in full (T. 337).  Plaintiff read at a third grade level.  Standard testing also revealed a memory deficit.  *Id.*  Dr. Donaldson noted that plaintiff said he did not cook much or do laundry.  Plaintiff stated he cleaned, played guitar and attempted to go out daily (T. 336).  Plaintiff reported that he got along with co-

15

workers and supervisors "O.K." (T. 335).   Dr. Donaldson found plaintiff had dysthymic disorder, dismissed the possibility of panic disorder and personality disorder, and deferred a diagnosis on mild mental retardation (T. 337-38).   Dr. Donaldson deferred this diagnosis because he could not find whether the intellectual deficit manifested during the developmental period or whether there were adaptive deficits (T. 338).   Plaintiff had a GAF of fifty to sixty and psychosocial and developmental issues.   Plaintiff had limited ability in his interpersonal relationship skills, motivation, ability to attend to relevant stimuli, relate to supervisors and co-workers, and perform repetitive tasks.   Plaintiff's ability to understand, remember, and carry out one- or two-step job instructions seemed to have been impaired (T. 338).

On July 8, 1999, Catherine A. Flynn, a State agency psychological consultant, reviewed the medical evidence and opined that plaintiff's ability to adapt, interact socially, and carry out simple instructions remained intact (T. 340-42).   Plaintiff had no substantial loss in the ability to perform the mental demands of routine tasks and was moderately limited only in understanding, performing, and carrying out detailed instructions. *Id.*

On July 16, 1999, Dr. Milton I. Setnar, a consultative physician, found that plaintiff was well-developed and in no distress (T. 353-55).   Dr. Setnar noted plaintiff could lift and carry twenty pounds, sit for ten minutes, climb five to six steps, stand for five minutes, and walk one block (T. 353).   Plaintiff remained oriented and his intelligence was consistent with having a tenth grade education (T. 354).   Plaintiff walked, got on and off the examining table without assistance, and had no edema, calf tenderness, or clonus.   Deep tendon reflexes proved normal and no muscle spasms occurred (T. 354, 357).   Plaintiff flexed to seventy out of ninety degrees and extended to twenty out of thirty degrees (T. 359).

Plaintiff's lateral flexion was full, Patrick's test was positive, yet Homan's test and straight

leg raising test were negative (T. 354).   Plaintiff's sensation remained intact and his motor

strength was full.   Plaintiff's neurological exam was normal (T. 354, 357).   Plaintiff's right

hand contained finger joint abnormalities, but he could still grasp and manipulate objects

(T. 354).   Dr. Setnar concluded that plaintiff had chronic complicated mechanical back pain

and status post right hand injury (T. 355).   Plaintiff's ability remained the same except that

he was limited in sitting or standing for more than five to ten minutes due to back pain, and

lifting and/or carrying more than twenty pounds due to a self-imposed limitation (T. 354).

Plaintiff did not appear to have a mental impairment and retained a normal capacity for

understanding, memory, social interaction, adaption, and sustained concentration and

persistence.  *Id.*

Dr. Myung J. Cho, a State agency medical consultant, reviewed the evidence on

August 24, 1999 and opined that plaintiff could lift ten pounds frequently and twenty

pounds occasionally.   Plaintiff could also sit and stand and/or walk for six hours each a day

(T. 362, 368).    Plaintiff's ability was limited in pushing and pulling with his upper

extremities, handling, and fingering (T. 362, 364).   Plaintiff could perform all postural

activities frequently or occasionally with the exception that he could never climb ladders,

ropes or scaffolds (T. 363).   This assessment was later affirmed by Dr. Paul Dillahunt (T.

368).

Dr. Rohner reported on August 31, 1999 that plaintiff was performing spot work

painting approximately ten hours a week ( T. 447).   Plaintiff's movement remained slow

and he was flexed at the hips. Plaintiff had flat lordosis and could not stand fully erect.

While plaintiff flexed thirty degrees, his reflexes remained intact.  His knee extensions were

also positive.  Dr. Rohner prescribed Norco and Soma and requested authorization for epidural injections (T. 447).  Dr. Rohner reported on January 11, 2000 that plaintiff had attempted to return to work, but ceased work due to pain after working three days (T. 447).  Plaintiff appeared depressed, walked slowly, and could only tolerate lying flat for two minutes.  Plaintiff's reflexes were intact, but popliteal compression and knee extension test caused pain.  Dr. Rohner found plaintiff had lumbar pathology, depression, and diabetes.  On February 24, 2000, Dr. Rohner recommended that plaintiff should seek treatment at a clinic because he had difficulty paying for his medications (T. 446).

On January 9, 2001, Dr. Joseph Schlonsky performed an orthopedic evaluation of plaintiff (T. 427-32).  Plaintiff was driven to the exam by his girlfriend and stated that he could lift a fifty pound suitcase and could walk a quarter of a mile (T. 427).  Plaintiff's gait was normal and he could walk on his heels and toes.  He could only sit for fifteen minutes.  Plaintiff could flex his lumbar spine sixty degrees, extend zero degrees, and laterally bend to fifteen and ten degrees on the right and the left side, respectively.  Plaintiff's left calf was smaller than his right calf and his reflexes were 1+ except for an absent left ankle reflex.  He was unable to perform a straight leg raising test due to pain (T. 428).  Except for decreased sensation in the L5 and S1 dermatomes, plaintiff's sensation was intact in his left leg (T. 427).  Plaintiff experienced no muscle weakness, spasms, or tenderness (T. 427-28).  Plaintiff had right hand deformities with some limitation in his range of motion (T. 428).  Dr. Schlonsky found that plaintiff had low back pain syndrome and problems with his right hand function with little function in three fingers (T. 428).  His left ankle reflex was depressed but no signs of nerve root compression or spinal cord injury were present.  Dr. Schlonsky believed plaintiff's back pain stemmed from scar tissue rather than nerve root

18

compression.  Plaintiff could pick up and manipulate objects, but would have difficulty with repetitive fine manipulation.  Dr. Schlonsky thought plaintiff would be limited to sedentary and some light work (T. 428).

Dr. Donaldson's January 17, 2001 evaluation of plaintiff was similar to his first report (T. 433-34).  Plaintiff's psychomotor activity was slow and he had mood swings.  Plaintiff had sleep and appetite problems (T. 434-35).  Plaintiff could only recite three digits backwards instead of four.  Plaintiff's performance IQ was 76, his verbal IQ was 61, and full scale IQ was 69 (T. 436).  Plaintiff read at a second grade level.  Plaintiff was also given the Minnesota Multiphasic Personality Inventory test, but Dr. Donaldson did not interpret the scores as he believed the plaintiff may have exaggerated the severity of his complaints (T. 437).  Dr. Donaldson found plaintiff had dysthymic disorder, psychosocial and medical stressors, a GAF of fifty to sixty, and a mental retardation assessment was deferred.  *Id.*  Dr. Donaldson's functional assessment remained unchanged.  *Id.*

A March 8, 2001 myelogram of plaintiff's lumbar spine showed post-operative status, but no evidence of disc bulging or herniation or spinal stenosis (T. 441-42).  According to Joseph Schultz, M.D., a radiologist, a lumbar CT scan performed on the same date was unremarkable (T. 443).

On April 5, 2001, Dr. Rohner stated that plaintiff was permanently disabled from pursuing substantial gainful activity in any field for which he was suited by age, education, and experience (T. 438).  Plaintiff's symptoms were totally disabling.  Dr. Rohner concluded that the myelogram and CT scan tests revealed a herniated disc, which rendered plaintiff unable to work as a heavy laborer.  Plaintiff could not lift more than ten pounds.  Plaintiff could stand for three hours, walk for less than one hour, and sit for two

hours a day, non-continuously.  Plaintiff could grasp, handle, push and pull, perform fine manipulation, and use foot controls (T. 440).  However, he could never bend, kneel, squat, crawl, or climb ladders with the exception of the ability to occasionally climb stairs (T. 440).

Dr. John Wolfe, a medical expert, testified at plaintiff's hearing that plaintiff had hypertension, diabetes mellitus, and failed back syndrome, status post laminectomy. However, Wolfe concluded that these aliments did not meet or equal the requirements of the Listings, including Listing 1.05(c) (T. 110, 115).  Plaintiff did not meet or equal Listing 1.05(c) because he lacked any significant motor deficit.  Dr. Wolfe, while considering plaintiff's subjective complaints and Dr. Rohner's assessment, stated that plaintiff could lift, push, and pull twenty pounds occasionally and ten pounds frequently. Dr. Wolfe also concluded that plaintiff could stand and walk for four to six hours a day, for approximately one hour at a time with a five minute break (T. 110-115).  Dr. Wolfe did not include any sitting limitations and stated plaintiff could occasionally bend, but should avoid climbing, balancing, crawling, unprotected heights, and fine manipulation (T. 111-112).

## IV.  Evaluation of Treating Physician's Opinion

The Social Security Regulations require that the opinion of a claimant's treating physician which reflects judgments about the nature and severity of the claimant's impairments must be given "controlling weight" by the ALJ, as long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ."  20 C.F.R. § 404.1527(d)(2); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).  If the opinion of the treating physician as to the nature and severity of the claimant's impairment is not given controlling weight, the Regulations require the ALJ to apply several factors to

decide how much weight to give the opinion, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). The ALJ must "always give good reasons" in the notice of determination or decision for the weight given to the treating source's opinion, 20 C.F.R. § 404.1527(d)(2), and "cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa*, 168 F.3d at 79 (internal quotation omitted); *see also Rooney v. Apfel*, 160 F. Supp. 2d 454, 465 (E.D.N.Y. August 14, 2001).

As explained by the Social Security Administration, when the ALJ's determination:

is not fully favorable, *e.g.*, is a denial . . .[,] the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996).

Plaintiff's treating physician, Dr. Ralph G. Rohner, in a report dated April 27, 2001, stated that plaintiff was "permanently and totally disabled from the pursuit of substantial, gainful employment . . .." (T.438). At plaintiff's last appointment, in March 2001, Dr. Rohner reported that knee extension tests bilaterally resulted in severe back and buttock pain. Repeat myelography and CT scan were unremarkable, but Dr. Rohner felt that it indicated a disc herniation at L3-4, which was confirmed by another surgeon and radiologist. *Id.* Dr. Rohner stated that such herniation is not infrequent directly above the site of previous spinal surgery. *Id.* Dr. Rohner also concluded that plaintiff could stand

21

less than three hours per day, but not continuously, walk less than one hour, sit less than two hours per day, but not continuously, occasionally and frequently lift or carry less than ten pounds, and is unable to for bend, kneel, squat, crawl, and climb stairs and ladders (T.439-440).

The ALJ rejected Dr. Rohner's opinion, plaintiff's primary treating physician, because "the medical evidence of record does not support it" (T. 61). The ALJ also stated that Dr. Rohner's opinion conflicts with his previous release of the plaintiff to return to work and that Dr. Rohner suggested that plaintiff obtain his GED, implying that plaintiff could perform a fuller range of light work with his GED. *Id.* The latter two justifications are not appropriate reasons for rejecting Rohner's medical opinion of plaintiff's status. Both of these reasons required the ALJ to make unjustified and improper inferences. Dr. Rohner released the plaintiff to return to work only "as tolerated" (T. 333). The plaintiff did not complete a trial period, however, and left work after only three days in January 2000 due to severe pain (T. 447.)  Further, Dr. Rohner's discussion with plaintiff about obtaining a GED (T.326) is irrelevant to plaintiff's RFC at the time Dr. Rohner gave his opinion.  It is obvious that a claimant's employment opportunities are expanded with further education, but advice to the plaintiff about his possible educational goals is in no way reflective of the plaintiff's impairment status or Dr. Rohner's credibility as a treating physician.[5]

Here, the ALJ did not acknowledge the treating-physician rule or adequately explain

---

[5]  Additionally, the ALJ found that Dr. Rohner's assessment of plaintiff's RFC was inconsistent with plaintiff's own testimony that Dr. Rohner advised him he could lift 20 to 25 pounds (T.107).  It is noted that, after responding to the question, plaintiff stated that he could not specifically recall the weight limitation placed on him by Dr. Rohner and that it had been "sometime ago."  *Id.*  After detailing the many inaccuracies and inconsistencies in plaintiff's hearing testimony and finding his claims of pain and limitation not credible (T.60, 61, 64), the ALJ apparently accepted the truth of this portion of plaintiff's testimony so as to discredit Dr. Rohner's opinion.

how it applied to this case.  *See Tornatore v. Barnhart*, 2006 WL 3714649, *3 (S.D.N.Y. December 12, 2006).  The ALJ's statement that "claimant has the physical capacities to which Dr. Wolfe testified" (T.57) indicate that the ALJ did not give Dr. Rohner's findings controlling weight.  However, it remains unclear whether, in determining precisely what weight to give Dr. Rohner's opinion, the ALJ considered such factors as "the frequency of examination," the "length, nature and extent of the treatment relationship," and the fact that Dr. Rohner is an orthopedic specialist.  *See* 20 C.F.R. § 404.1527(d)(2).  The record indicates that Dr. Rohner has been treating the plaintiff since March 1996 and saw plaintiff between twenty-five and thirty times since the onset of plaintiff's injury (T. 36-49).  It cannot be said that the ALJ has complied with the regulations and case law requiring him to "comprehensively set forth reasons for the weight assigned" to Dr. Rohner's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(d)(2).

The ALJ's primary rationale for rejecting Dr. Rohner's opinion is that it was not supported by the medical evidence in the record (T. 61).  The ALJ cited various medical findings such as normal reflexes, but failed to state with specificity the reasons that Dr. Rohner's opinion was not medically supported.  For instance, Dr. Wolfe did not testify that Dr. Rohner erred in his diagnosis or findings, but simply stated that his own RFC assessment "is the one that I feel is supported by the evidence in the record."  (T.115). Additionally, the ALJ rejected the opinions of other consultative examining sources.  Dr. Rutherford, an examining orthopedic surgeon, found that plaintiff was totally disabled and incapable of performing any work, at least for the period of March 26, 1996 through September 27, 1997.  The ALJ inexplicably rejected this opinion because it was "in the style of the Ohio Bureau of Worker's Compensation."  (T.62).  The ALJ also rejected the

23

opinion of Dr. Setnar because it was "merely a repetition of the claimant's subjective complaints." *Id.* However, Dr. Setnar's reliance on plaintiff's subjective complaints does not undermine his opinion. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2nd Cir. 2003). "Subjective *pain* may serve as the basis for establishing disability." *Donato v. Sec. of Dep't of Health and Human Servs.*, 721 F.2d 414, 418-19 (2nd Cir. 1983) (emphasis in original). Additionally, Dr. Setnar noted plaintiff's "abnormal range of motion" and medical history in support of his determination that plaintiff could neither sit nor stand longer than five to ten minutes (T.354).

The ALJ erred in assessing the opinion of plaintiff's treating physician, Dr. Rohner. Accordingly, a remand is necessary to properly assess the opinion of the treating physician and to determine plaintiff's RFC.

## V.  Plaintiff's Mental RFC

Plaintiff also argues that the mental RFC findings of the ALJ are not supported by substantial evidence. The ALJ found that plaintiff was limited to low stress work that did not require functional literacy (T.64). Alan White, a consultative psychologist found that plaintiff suffers from dysthymic disorder and borderline intellectual functioning (T.260). Dr. White found that plaintiff's ability to remember, concentrate and attend is mildly impaired and he would probably have "disruptive problems secondary to depression and chronic fatigue, particularly with work perseverance over prolonged periods of time." (T.260-61). Additionally, Dr. White found plaintiff's ability to withstand stress from a stressful environment was mildly impaired. *Id.* Dr. Roseanne Umana, a state review psychologist, found that plaintiff was moderately limited in his ability to understand and remember

24

detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (T.272-73).  Dr. Umana found that plaintiff could follow simple instructions, relate appropriately to coworkers, deal with routine change, and make simple decisions (T.274).   Likewise, Dr. Catherine Flynn, another state review psychologist, found that plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions (T.340).  The ALJ was not obligated to give the opinion of Dr. White controlling weight, as he was not a treating source, and could rely on the assessments of the state review psychologists.  The ALJ's RFC assessment, in which she determined that plaintiff could function in a low stress position that did not require functional literacy, is supported by substantial evidence.

## VI.  Sufficiency of Vocational Expert's Testimony

Plaintiff asserts that the vocational expert's testimony was insufficient in establishing specific types of jobs in significant numbers in the national economy that plaintiff can perform. As the ALJ found both exertional and nonexertional limitations, sole reliance on the Grids is inappropriate.  *See Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).  Accordingly, the ALJ heard testimony from a vocational expert regarding jobs that exist in the local and/or national economy that the plaintiff can perform. The vocational expert provided a basis of 1,500 jobs in the regional area and identified specific jobs such as laundry worker, cleaner, and packer positions (T. 122-23, 125).  Given the RFC as determined by the ALJ, it was not error to accept this VE testimony that there was significant work in the national economy that plaintiff was capable of

performing.

## **CONCLUSION**

Based on the foregoing analysis, and after a full review of the record, the court concludes that the ALJ's determination was based on an erroneous view of the legal standards for assessing the medical opinions of treating sources.   Accordingly, the Commissioner's motion for judgment on the pleading (Item 9) is denied and plaintiff's cross motion for judgment on the pleadings (Item 11) is granted.  The case is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

So ordered.

_____\s\ John T. Curtin_____
JOHN T. CURTIN
United States District Judge

Dated: 5/23                       , 2007
p:\pending\2002]02-533.feb107